People v Porter (2026 NY Slip Op 26017)

[*1]

People v Porter

2026 NY Slip Op 26017

Decided on January 30, 2026

Supreme Court, Queens County

Johnson, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on January 30, 2026
Supreme Court, Queens County

The People of the State of New York

againstAllen Porter, Defendant.

Ind. No. 1980/1992

Michelle A. Johnson, J.

BACKGROUNDOn April 23, 1992, defendant was arrested for a double homicide that occurred in the parking lot of the Woodside Housing project on December 30, 1991. On or about September 14, 1995, defendant's jury trial commenced with ADA Richard Schaeffer as the lead prosecutor and Edwin Schulman, Esq., as defendant's counsel. On October 6, 1995, the jury found defendant guilty of two counts of Murder in the Second Degree and one count of Criminal Possession of a Weapon in the Second Degree. Subsequently, on January 31, 1996, the trial court sentenced defendant to consecutive indeterminate periods of incarceration of 20 years to life and 25 years to life respectively on each of the murder counts; and 3½ to 7 years on the weapons possession count. 
Defendant appealed his conviction to the Appellate Division, which affirmed the conviction but modified his sentence to run the weapon possession count concurrently with the two consecutive murder sentences, noting that there was overwhelming evidence of the defendant's guilt (256 AD2d 363 [2d Dept 1998]). The Court of Appeals denied defendant leave to appeal to that court (93 NY2d 976 [1999]). Defendant's petition for writ of error coram nobis was thereafter denied (4 AD3d 377 [2nd Dept. 2004], appeal denied, 3 NY3d 646 [2004] and lv denied, 31 AD3d 669 [2nd Dept. 2006]); and his petition for a writ of habeas corpus was also denied (Porter v. Grenier, 2005 WL 3344828 [EDNY 2005]).
In May of 2021, defendant, through counsel, petitioned the Conviction Integrity Unit (CIU) of the Queens District Attorney's office to investigate his case, after defendant's FOIL requests revealed previously undisclosed materials related to the case. The CIU determined that it had no basis to vacate defendant's conviction, but that its investigation was ongoing (see People's Response in Opposition to Defendant's Motion to Vacate, dated 6/20/2024, pp.59-60). Two years later, in April 2023, defendant withdrew his petition from CIU consideration; and on November 21, 2023, filed the instant motion to vacate judgment pursuant to CPL §§ 440.10(1)(d), (h) and (g). Upon review of all papers submitted, this Court granted a hearing pursuant to CPL § 440.30(5), to resolve disputed issues of fact (see Decision and Order dated 1/12/2025); and expanded the scope of such hearing to include additional newly discovered Brady/Giglio information (see Decision and Order dated 10/17/2025).
On multiple dates beginning October 31, 2025, and concluding December 10, 2025, this Court conducted a post-conviction 440 Hearing (hereafter 440 Hearing) at which defendant called six (6) witnesses: ADA Richard Schaeffer (retired), Detective Richard DeFillippis (retired), Wendy Campbell Walker, Michelle Porter, Edwin Schulman, Esq., and Wanda [*2]Campbell. The People called one (1) witness, Willis Campbell.[FN1]
 I credit the testimony of all witnesses as logical, consistent, and worthy of belief except as otherwise specifically indicated herein. From all of the evidence adduced at the 440 Hearing, I make the following findings of fact and conclusions of law: 
FINDINGS OF FACTIn December 1991, Detective Richard DeFilippis was assigned to Police Service Area 9 (PSA-9) of the New York Police Department's Housing Authority Developments (HAPD), which included the Woodside Housing Projects in Queens County (H112).[FN2]
He worked closely with his direct supervisor, Lieutenant William McGuire, who was the PSA-9 Unit's Squad Commander (H111).[FN3]

On December 30, 1991, Detective DeFillippis responded to a radio run of two people shot in a car in the parking lot of the Woodside Houses, later identified as Charles Bland (aka Tiz) and Cherrie Walker, both deceased (H109). Cherrie Walker's four-year-old son, Melvin Reid, was also in the car at the time of the shooting but was not physically injured.
Detective DeFillippis was assigned as the lead investigator with the assistance of his supervisor and good friend, Lt. McGuire. While the initial investigation established that three or four shooters approached the car and fired multiple shots into the vehicle occupied by the deceased victims and the child, Detective DeFillippis had no identified eyewitnesses and/or suspects to the shooting incident. Additionally, while ballistics evidence was recovered at the scene, there was no forensic evidence leading to the identity of the shooters (H118). 
Four months later, on or about April 23, 1992, Det. DeFillippis interviewed Jacqueline Aviles, a purported eyewitness to the shooting who identified defendant as one of the shooters (see People's Opposition to Defendant's Motion to Vacate Judgment dated June 18, 2024, Paragraphs 52 — 61). Ms. Aviles told Det. DeFillippis that she knew defendant from the neighborhood and observed him to be one of the shooters firing a gun into the car occupied by the deceased victims and a child. Defendant first became a target of the investigation following Aviles' interview (H119) and was subsequently arrested for the Bland/Walker homicides later that same day. Jacqueline Aviles was a material prosecution witness at defendant's trial.
In May 1992, ADA Richard Schaeffer became the lead prosecutor on this case. He had served as an Assistant District Attorney (ADA) at the Queens District Attorney's Office (QDA) since May 8, 1989. After three years rotating through different bureaus and having completed eleven (11) felony trials, ADA Schaeffer was transferred to the Homicide Trials Bureau (HTB) in 1992 (H42-44). Upon arrival at HTB, ADA Schaeffer assumed the lead over thirteen (13) homicide prosecutions, including the instant case (H53). 
ADA Schaeffer soon learned that the case against defendant was based on the testimony of one eyewitness, Jacqueline Aviles. Upon reviewing the evidence, he became concerned about the strength of the case because, as he opined, single witness identification cases are often problematic (H57). In fact, he admits that he had doubts about Aviles' account based upon the forensic evidence at the crime scene (H72). As a result, ADA Schaeffer determined that it was prudent to delay the trial so he could take steps to enhance the case by locating additional eyewitnesses and/or evidence (H57). As such, ADA Schaeffer directed Det. DeFillippis to enhance the case by looking for more evidence (H148).
Undisclosed Brady/Giglio material relative to Vanessa Thomas: 
To enhance the case, Det. DeFillippis traveled to South Carolina on April 8. 1993, to interview Mark Rogers, who he learned had information about the murders at Woodside Houses (H195; see People's Hearing Exhibit #1). Mr. Rogers told Det. DeFillippis that shortly after Bland/Walker were killed a woman named Vanessa Thomas expressed to him that she felt "partially responsible" for their murders because defendant told her to beep him when she sees Bland leaving the building; which she did, and minutes later Bland and Walker were shot multiple times (H198; see People's Hearing Exhibit #1).
Significantly, Det. DeFillippis knew Vanessa Thomas prior to the Bland/Walker murders as a resident of the Woodside Houses. Prior to the Bland/Walker homicides, Det. DeFillippis considered Ms. Thomas to be a reliable source of information about incidents occurring in the area and would often visit her apartment, inconspicuously, to gather information when needed (H116). Det. DeFillippis also knew that Vanessa Thomas and Nathaniel Wright were in a romantic relationship with a child in common (H61). Both Vanessa Thomas and Nathaniel Wright were material prosecution witnesses at defendant's trial.
Following the Rogers interview and to further enhance the case, Det. DeFillippis and Lt. McGuire traveled to Atlanta to locate Vanessa Thomas and Nathaniel Wright. At the 440 Hearing, Det. DeFillippis explained, incredibly, that he was looking for Thomas because he thought she "might have information" about the case; and he was looking for Wright because he had an active misdemeanor warrant in New York (H149).[FN4]
When asked how Wright would enhance the investigation, Det. DeFillippis explained that Wright would likely have information about the murders due his affiliation with defendant and another drug crew at the Woodside Houses (H222). 
Detective DeFillippis' testimony is completely discredited, however, by his own DD5s and police documents in the HAPD case folder. For Det. DeFillippis and Lt. McGuire to secure monies and authorization for travel to Atlanta, a HAPD Request for Travel Authorization Memorandum dated 11/1/1993 was submitted to the HAPD Chief of Department for approval. This memorandum clearly outlines the purpose of the travel which was to locate and arrest Thomas in connection with the Bland/Walker murders. Notably, the Request for Travel Authorization makes no reference at all to Nathaniel Wright or any connection he might have to the homicide investigation (see Defense Exhibit K, HAPD Request for Travel Authorization Memorandum, dated 11/1/1993). This suggests that any search for Nathaniel Wright in [*3]connection with this case, may have been merely incidental to locating the target, Vanessa Thomas. 
Nonetheless, Det. DeFillippis testified, unbelievably, that prior to and during the 1993 Atlanta trip, he was unaware of any intent to arrest Thomas; unaware of any conversation with Lt. McGuire or ADA Schaeffer concerning Thomas' criminal liability; and unaware that ADA Schaeffer sent a letter of intent to arrest Thomas to the East Point Police Department (hereafter East Point PD) (H148—151). Here again, his testimony is directly contradicted not only by the HAPD Request for Travel Authorization Memorandum referenced above which states that the "lead prosecutor is prepared to arrest, indict, and return the suspect [Thomas] to New York" (see Defense K supra); but also by his own DD5 dated 11/1/1993 wherein he acknowledged ADA Schaeffer's letter of intent to arrest Thomas upon a finding of probable cause (see Defense Exhibit SS, DeFillippis DD5 dated 11/1/1993). Hence, the 440 Hearing evidence convincingly established that the purpose of Det. DeFillippis 1993 Atlanta trip was to enhance the case and secure additional evidence by locating and arresting Thomas for her role as an accessory in the Bland/Walker homicides. 
It strains credulity to accept that Det. DeFillippis, the lead detective responsible for memorializing, reviewing, and pursuing all investigative leads in the case, would not have been made aware of important developments to locate and apprehend Thomas for the very crimes he was charged with investigating. His own police paperwork belies this very proposition. For example:
1. DeFillippis DD5 dated 10/3/1993 (Defense Hearing Exhibit QQ): Detailing outreach efforts to Sergeant Jack Lambert of the East Point PD in Atlanta, Ga, seeking assistance to find Thomas and Wright in Atlanta and noting that if he "finds Nathaniel, Vanessa is close by."2. DeFillippis DD5 dated 11/1/1993 (Defense Hearing Exhibit SS): Detailing notification from East Point PD that they located Thomas in Atlanta; that travel arrangements were made to "apprehend Wright" and "interview" Thomas; and that there is a "letter of intent to arrest Vanessa if the DA's Office feels there is P.C."3. HAPDs Request for Travel Authorization dated 11/1/1993 (Defense Exhibit K): Detailing the purpose for the requested travel authorization to Atlanta and the monies needed to achieve that purpose as follows:a. To locate a "female known to the department" who has been "directly linked to the Bland/Walker homicides" (see para 4); b. That the lead prosecutor in this case, ADA Richard Schaeffer, is "prepared to arrest and indict this individual and return 'her' to New York" (see para 5); andc. Monies requested for the cost of the detectives two round-trip tickets plus the cost for "bringing the 'suspect' back" (para 6).4. DeFillippis DD5 dated 11/4/1993 (Defense Hearing Exhibit RR): Detailing requested assistance from the Fulton County District Attorney's Office to subpoena correct address information for Vanessa Thomas in Georgia.5. DeFillippis DD5 dated 5/18/1994 (Defense Hearing Exhibit TT): Memorializing Det. DeFillippis' interview of a witness, Sherrie Branch, who reported overhearing a conversation between Thomas and the deceased, Cherrie Walker, the day before the murders during which Thomas warned Cherrie Walker that, "she heard C-God [Nathaniel Wright] and Al talking on the phone about Tis [Charles Bland]," and "something was [*4]going to happen."Moreover, based on the information Mark Rogers provided to Det. DeFillippis, ADA Schaeffer, in his capacity as the lead prosecutor of the case, concluded that there was probable cause to arrest Thomas as an accomplice in the Bland/Walker homicides (H63). Shortly thereafter, ADA Schaeffer learned that Thomas and Wright "apparently fled Queens shortly after the double murder" (H61). Det. DeFillippis and Lt. McGuire began looking for Thomas and Wright for over a year believing the two were somewhere together with a child in common (H61).
Once Thomas and Wright's whereabouts were confirmed, and in preparation for Det. DeFillippis and Lt. McGuire's travel to Atlanta to locate them, ADA Schaeffer sent a letter, on official Queens District Attorney Letterhead, to Sgt. John Lambert of the East Point PD dated November 2, 1993, in which he:
1. identified himself as the lead prosecutor in the case against defendant.2. acknowledged his awareness that Thomas was living in Atlanta under an assumed alias, "possible a/k/a Anagjid Walston."3.stated that it is the "position of the District Attorney's Office" that the police "have probable cause to believe that one Vanessa Thomas acted in concert with [defendant] in the planning of the murder of Charles Bland and that Vanessa Thomas took affirmative action that aided [defendant] and others in the shooting of Charles Bland and Cherrie Walker."4. stated that "it is the intention of the District Attorney's Office to prosecute Vanessa Thomas for acting in concert with [defendant] for the murder of Charles Bland."5. informed the East Point PD that, "upon [Det. DeFillippis'] positive identification of Vanessa Thomas," and "upon an arrest 'by your Department' of this individual, it is the intention of the District Attorney's Office to file . . . a felony complaint charging [her] with . . . Murder in the Second Degree . . . "(see Defense Hearing Exhibit G). 
Additionally, the day before Det. DeFillippis and Lt. McGuire traveled to Georgia, and consistent with his representations to the East Point PD, ADA Schaeffer either drafted or caused to be drafted the following documents:
1. A felony complaint against Vanessa Thomas charging two counts of Murder in the Second Degree which contained sworn allegations of fact subscribed and verified by Lt. McGuire under penalty of perjury on November 2, 1993 (see Defense Hearing Exhibit H); and 2. Other QDA paperwork, consistent with the prosecutor's publicly expressed intent to arrest Thomas and declaration of her accessorial liability which was never filed with the court including:a. An Arraignment Card in the case of "People v. Vanessa Thomas."b. A pre-arraignment notification report in the case of "People v. Vanessa Thomas."c. A Warrant Investigation Report/Arrest Warrant in the case of "People v. Vanessa Thomas."d. A Queens District Attorney's Office Data Sheet, bearing "Arrest No. W2440/1993" in the case of "People v. Vanessa Thomas."e. An unsigned Notice pursuant to CPL §§ 190.50, 250.20, and 710.30 in the case of "People v. Vanessa Thomas."(see Defense Hearing Exhibit W).Prior to the detectives 1993 Atlanta trip, ADA Schaeffer concluded that there was legally sufficient probable cause to charge Thomas accessorily with the Bland/Walker murders based on the Mark Rogers interview implicating Thomas in beeping defendant to alert him of Charles Bland's location just before the shooting; phone records corroborating Mark Rogers account; Thomas' subsequent flight from New York shortly after the murders; and her living out of state under an assumed name (H408). However, Thomas was not arrested in Atlanta. Instead, Wright was arrested and transported to the East Point PD. Thomas arrived at the precinct in Atlanta voluntarily. While there, Thomas gave a Mirandized statement to Det. DeFillippis denying that she intentionally acted to assist defendant in the murder of Charles Bland. Despite ADA Schaeffer's prior conclusion of probable cause for Thomas' arrest, and based solely on her denial of culpability, Thomas became a primary prosecution witness instead of a target of the investigation. 
At the outset, the People concede that they did not provide any of the above referenced arrest paperwork, documentation, or information pertaining to Thomas' culpability or arrest to defendant prior to trial (H64). Specifically, the People did not disclose: (1) Lt. McGuire's sworn felony complaint charging Thomas with the Bland/Walker murders (see Defense Hearing Exhibit H); (2) ADA Schaeffer's letter to the East Point PD informing of its unequivocal intent to arrest, indict, and extradite Thomas to New York for the Bland/Walker murders and authorizing the East Point PD to arrest Thomas within its jurisdiction (see Defense Hearing Exhibit G); or (3) any of the other internal district attorney arrest paperwork the prosecutor drafted consistent with its publicly expressed intent to arrest Thomas (see Defense Hearing Exhibit W) (H64; H314-317). 
Further, ADA Schaeffer concedes that he did not disclose any district attorney or police documents containing information relative to the determination that there existed probable cause to arrest Thomas (H314-316). This is consistent with the lack of Bates Stamps on the police DD5 paperwork detailing Det. DeFillippis' efforts and engagement with the East Point PD to locate Thomas or the purpose for which travel to Atlanta was requested and authorized by HAPD.[FN5]
Specifically, ADA Schaeffer admits that Defense Hearing Exhibits K, QQ, RR, SS and TT do not contain Bates Stamps indicative of its disclosure to defendant prior trial (H459-467).
Moreover, I credit the testimony of defendant's trial counsel, Mr. Schulman, that he was wholly unaware of the prosecutor's probable cause determination to arrest Thomas for participating in the Bland/Walker murders or the purpose of Det. DeFillippis' 1993 Atlanta trip being to arrest her (H505-507). Mr. Schulman further clarified that despite Lt. McGuire's testimony at a pre-trial hearing in this case, ADA Schaeffer never disclosed the unfiled but sworn felony complaint charging Thomas with the Bland/Walker murders (H508-509). Accordingly, I find that ADA Schaeffer did not disclose various police records and QDA documents containing Brady/Giglio material relative to the credibility of Thomas' trial testimony [*5]and her consideration as a suspect/accomplice, and to the credibility of the overall police investigation.
The 440 Hearing evidence convincingly established the prosecutors deliberate suppression of any and all information pertaining to Thomas's "flight" shortly after the double homicides (H348); assumption of an alias while living in Atlanta (H349-350; H359); investigative steps taken to locate her for over a year (H348); the lead prosecutor's publicly expressed probable cause determination to charge her as an accomplice to the Bland/Walker murders; the purpose of Det. DeFillippis and Lt. McGuire's 1993 Atlanta trip being to arrest, indict, and return Thomas to New York to face charges for the Bland/Walker homicides; the lead prosecutor's letter to the East Point PD in Atlanta advising of the probable cause determination and authorizing the East Point PD to arrest her upon a positive identification by Det. DeFillippis; Lt. McGuire's signed sworn felony complaint in the case of "People v. Vanessa Thomas" containing murder charges for Bland/Walker homicides; the prosecutors internal draft paperwork bearing an "arrest number," even though they claim no such arrest ever occurred; or that contrary to Thomas's Mirandized statements to DeFillippis during the 1993 Atlanta trip claiming inadvertent participation in the murders, a witness overheard Thomas warning the deceased, Cherrie Walker, that "something was going to happen," the day before the shooting occurred (H463-464).
Undisclosed Brady/Giglio material relative to Prosecutor's Exculpatory Handwritten Notes:On or about August 14, 2025, the People disclosed, for the first time, ADA Schaeffer's handwritten notes which memorialized a telephone interview he conducted with Doria Holly, a woman who lived in the Woodside Houses on or about the time of the Bland/Walker homicides. Doria informed ADA Schaeffer that she had information about the murders, including a possible eyewitness (see Defense Hearing Exhibit O; H467). While ADA Schaeffer does not specifically recall the conversation, he confirmed that the notes were written by him in his own handwriting, and they reflect information that he received from Doria Holly between 1993 and 1995 before defendant's trial (H467). He further admits that he did not disclose to defendant either the handwritten notes or the substance of the information Doria Holly reported prior to defendant's trial (H322). ADA Schaeffer's notes of Doria Holly's interview states, in relevant part, that:
Doria went with Al.Wendy told Doria that Al didn't do it; that Willis saw it; Willis didn't see Al there.Wendy is Sister.Willis Campbell . . . 19 now . . . lives down south . . . mother just passed away.
ADA Schaeffer characterized his notes as "triple hearsay" in that it states what Doria Holly told him based on what Wendy told her, which is that "Al didn't do it," and "Willis saw it," referring to the Bland/Walker homicides (H326-329). ADA Schaeffer concedes that this information constitutes exculpatory Brady material that he was obligated to timely disclose to defendant (H330), yet he took no steps to follow-up on or investigate the existence of a possible eyewitness who purportedly claimed defendant did not do it (H322-327). Nor did he forward the information to the lead detective for further investigation. Instead, ADA Schaeffer surmised that "in a perfect world, that should have been pinned down . . . so maybe that was one of those things that wasn't pursued" (H326). 

Had ADA Schaeffer pursued the information provided, it would undoubtedly have led to Wendy Campbell and Willis Campbell thirty years ago. At the 440 Hearing, Willis Campbell [*6]denied witnessing the Bland/Walker murders and denied telling his sister that defendant didn't do it (H605-606; H616). However, both of Willis' older sisters, Wendy and Wanda Campbell, testified about the circumstances surrounding Willis' report of witnessing the shooting to each of them separately at different times during his lifetime. I credit the testimony of Wendy and Wanda Campbell as logical, rationale, and worthy of belief; and discredit the testimony of Willis Campbell concerning his whereabouts on or about the time of the shooting thirty years ago.Willis confirmed, however, that he knew defendant by sight as one of the residents of the Woodside Houses involved in selling drugs to the community.[FN6]

Wendy Campbell, a retired nurse, grew up in the Woodside Houses with her parents and four siblings, including her older sister, Wanda Campbell, and youngest brother, Willis Campbell. Wendy confirmed that Doria Holly, now deceased, was her childhood friend and that thirty years ago she told her what Willis said about witnessing the Bland/Walker murders (H244). Wendy recalled that she was at her parents' apartment on December 30, 1991, which was her birthday. While there, at approximately 9:00pm, she observed Willis come running into the apartment out of breath, panicked, shaky, nervous, and speaking rapidly. Willis stated that he just saw somebody shoot "Tiz and his girlfriend in a car." He further said that he was hiding in the bushes next to the rental office because he did not want anyone to see who he was and try to kill him (H241). After the shooting stopped, he ran up the walkway and saw Doria Holly and told her not to go that way (H239-241). Wendy asked Willis who shot her. To which Willis replied, "some dudes I don't know, probably from Queensbridge or Astoria" (H241). After learning of defendant's arrest for the double murders, Willis asked Wendy "why they got Al, he didn't do it, he wasn't there" (H268). Notably, Wendy's testimony is corroborated by ADA Schaeffer's own handwritten notes of Doria Holly's interview thirty years ago.
Wanda Campbell recalled that sometime between 2008 and 2009, Willis came to visit her home down south. During that visit, Willis told her, that he "almost got killed when he hid behind a mailbox in front of the rental office as a guy was shooting into a car (H625). Willis said he heard bullets and glass shattering and that after the bullets stopped, he made eye contact with the shooter, then the guy just drove away (H625). When it got quiet, Willis said he heard a baby crying (H625). Willis also said that he "did not know the shooter, but the shooter saw him" (H638). Finally, Willis told Wanda that two people were killed in the car and that he saw the whole thing" (H638). Only Wanda and Willis were present during this conversation which occurred over fifteen (15) years after his initial report to Wendy. Here again, Wanda's testimony is corroborated by Wendy Campbell's account and ADA Schaeffer's own handwritten notes of Doria Holly's interview.
The Jury Trial:Defendant's jury trial commenced on or about September 14, 1995. The theory of prosecution was that defendant was both principally and accessorily liable for the Bland/Walker murders (H306). In support of this theory, the People's primary witnesses at trial were Jacqueline Aviles, Vanessa Thomas, and Nathaniel Wright. Aviles testified that she knew defendant to be a drug dealer at the Woodside Houses and she observed him to be one of the shooters who fired shots into the car occupied by Bland and Walker. She was the prosecutor's [*7]only eyewitness to the shooting and only witness to identify defendant as one of the shooters. Vanessa Thomas testified that she and defendant were friends and defendant sold drugs at the Woodside Houses with her boyfriend, Nathaniel Wright. Thomas further testified that, at defendant's request, she beeped him to notify him of Bland's location moments before the shooting inadvertently setting in motion the events leading to Bland and her best friend, Cherrie Walker's death. Nathaniel Wright testified, pursuant to a cooperation agreement, that he and defendant sold drugs together at the Woodside Houses; that Vanessa Thomas was his girlfriend and mother of his child; and that although defendant was not one of the shooters, he and defendant planned the murder of Charles Bland together in retaliation for the past murder of defendant's friend, "Shaheim."
Based on the evidence presented at trial, ADA Schaeffer argued to the jury that there were two mutually exclusive paths of evidence leading to defendant's guilt. The first rested entirely upon the testimony of Jacqueline Aviles, the sole identification eyewitness, which if believed, would establish that defendant was one of multiple shooters who fired shots into the car causing the deaths of Charles Bland and Cherrie Walker (H73-74). The second, rested entirely upon the testimony of Vanessa Thomas and Nathaniel Wright, which if believed, would establish that defendant acted in concert with Nathaniel Wright and unapprehended others to solicit, organize, and plan the murder of Charles Bland in retaliation for the past murder of his friend, "Shaheim." In summation, the People argued that the evidence taken together amounted to overwhelming evidence of defendant's guilt. However, under the latter acting in concert theory, the People contended that even if the jury discredited Aviles' eyewitness account of defendant as one of the shooters, he was nonetheless guilty for his role in aiding, abetting, and soliciting shooters to murder Charles Bland (H73-74). The prosecution had no independent physical or forensic evidence pointing to defendant as the perpetrator of the murders (H118).
During the charge conference before summations, Mr. Schulman requested that the court deliver the "Accomplice as a Matter of Law" instruction relative to Nathaniel Wright's testimony; and the "Impeachment by Benefit Conferred" instruction relative to Vanessa Thomas' testimony. The court granted the first, and in accordance with the People's objection, denied the latter (H510-512). Specifically, ADA Schaeffer successfully argued to the court that there was no reasonable view of the evidence to establish that Vanessa Thomas received a benefit for her testimony at trial. The jury deliberated for four (4) days before reaching a verdict (H536). At one point, the jury sent a note asking, "could we convict defendant if he wasn't even there?" (H307); to which the trial court responded, "Yes, if you believe the evidence beyond a reasonable doubt that he acted in concert with the shooters in planning it" (H307-309). Shortly, thereafter, the jury returned a verdict of guilty as indicated above.
CONCLUSIONS OF LAWDefendant moves to vacate his judgment of conviction on grounds that: 1) the judgment was procured by duress, misrepresentation or fraud on the part of the prosecutor, in violation of CPL § 440.10(1)(b); 2) material evidence adduced at trial was false and known by the prosecutor to be false, in violation of CPL § 440.10(1)(c); 3) such evidence was adduced by the People in violation of defendant's rights under the constitution of this state or of the United States, in violation of CPL § 440.10(d) and (h); and 4) new evidence has been discovered since the jury found him guilty which, if it had been received at trial would have resulted in a more favorable verdict, in violation of CPL § 440.10(1)(g). More specifically, defendant alleges, in part, that the prosecutor withheld substantial impeachment material pertaining to Vanessa Thomas, a primary [*8]witness at trial; and third-party culpability evidence, all of which he specifically requested upon a demand to produce discovery pre-trial. Defendant further contends that the People's suppression of this and other material substantially prejudiced his ability to lodge a defense at trial resulting in a reasonable possibility that the outcome of his trial would have been different.
It is axiomatic that the People have an affirmative constitutional duty, under Brady v. Maryland (373 US 83 [1963]) and its progeny, to disclose favorable evidence to the accused where such evidence is material to either guilt or to punishment (Id. at 87; People v. Fuentes, 12 NY3d 259 [2009]). Favorable evidence includes not only that which tends to exculpate the defendant, but also evidence that is useful to impeach the credibility of a prosecution witness (Giglio v. United States, 405 U.S. 150 [1972]; People v. Baxley, 84 NY2d 208 [1994]). The prosecution's failure to disclose Brady material violates a defendant's constitutional right to due process pursuant to the 14th Amendment irrespective of good or bad faith (Brady supra at 87; Giglio supra at 153-154; People v. Bryce, 88 NY2d 124 [1996]). To establish a Brady violation warranting a new trial, a defendant must show that (1) the evidence is favorable to defendant because it is either exculpatory or impeaching in nature; (2) the prosecutor suppressed such evidence, either willfully or inadvertently; and (3) defendant was prejudiced because the suppressed evidence was material (Strickler v Greene, 527 US 263 [1999]; People v. Giuca, 33 NY3d 462, 473 [2019]; People v. Fuentes at 263 [2009]; Brady v. Maryland, supra). The prosecutor's duty extends to the disclosure of evidence that can be used to impeach the credibility of a prosecution witness where such witness' testimony may be determinative of the defendant's guilt (see, People v. Spruill, 164 AD3d 1270 [2nd Dept. 2018], appeal denied 33 NY3d 954 [2019]). Moreover, Brady and its progeny may require disclosure of exculpatory and/or impeachment materials whether those materials concern a testifying witness or a hearsay declarant (United States v. Jackson, 345 F.3rd 59, 71 [2d Cir 2003]). Where the People fail to disclose to the defense evidence in its possession that is both favorable and material, the defendant is entitled to a new trial (see, People v. Negron, 26 NY3d 262, 269 [2015] citing, People v. Vilardi, 76 NY2d 67, 73 [1990]).
Under New York law, when a defendant makes a specific request for documents or information, the test of materiality is whether there exists a "reasonable possibility" that the undisclosed evidence would have altered the outcome of the trial (People v. Rong He, 34 NY3d 956 [2019]; People v. McCray, 23 NY3d 193 [2014]; People v. Vilardi, 76 NY2d 67 [1990]). Absent defendant's specific request for information, the applicable materiality test is whether there is a "reasonable probability" that the prosecutor's suppression of evidence undermines confidence in the outcome of the trial (Kyles v Whitley, 514 US 419 [1995]; People v Giuca, 33 NY3d 462 [2019]; People v. Vilardi, supra; cf. United States v. Bagley, 473 US 667 [1985]).
In this case, defendant's counsel served upon the prosecutor and filed with the court a Request for Bill of Particulars and Demand to Produce on or about July 10, 1992 (see Defense Hearing Exhibit A). Defendant made general and specific demands for exculpatory and/or impeaching information including, but not limited to:
(1) all written or recorded witness statements made in connection with the case for every witness called to testify at any proceeding, hearing, or trial (see Defense Hearing Exhibit A, Omnibus Motion);[FN7]
(2) whether there were any eyewitnesses to the incident known to the police department or the district attorney's office and if so, provide names and addresses (see Defense Hearing Exhibit A, Request for Bill of Particulars, para. [1][f]);[FN8]
(3) whether there were any persons who are "considered" to be accomplices or co-conspirators to the crimes recited in the indictment but who have not been mentioned therein . . . and if so, state their names and addresses (Id. at para. [1][zz]);[FN9]
(4) a copy of each and every police report, memorandum, or record concerning this case, of any sort, filed in connection with the investigation of the alleged crime (see Defense Hearing Exhibit A, Demand to Produce, para. [d]);[FN10]
(5) citing Brady v Maryland (373 US 83 [1963]) and Giglio v United States (405 US 150 [1972])...anything required to be disclosed, prior to trial, pursuant to the constitution of this state or of the United States (see Defense Hearing Exhibit A, Demand to Produce, para. [bb]);[FN11]and(6) Whether any prosecution witness is known to have used and alias (see Defense Hearing Exhibit A, Demand to Produce, para. [bb][11][d]).[FN12]Whereas here, defendant specifically requested all the information referenced above, the Court shall apply the "reasonable possibility" standard to its materiality analysis. 
Against this backdrop, we turn to the undisclosed evidence and information at issue here.
Impeaching evidence relative to prosecution witness Vanessa Thomas: 
As referenced above, the People concede that they did not disclose any impeachment evidence related to its legal determination and public declaration of Thomas as either a suspect in or accessory to the Bland/Walker murders. The People posit that since they never formally charged Thomas for the murders, they had no duty to disclose ADA Schaeffer's probable cause conclusions, which they characterize as nothing more than his mere "mental impressions" and "personal opinions" about the investigation (see People's 440 Hearing Memorandum of Law, [*9]dated 12/29/2025). The People's reasoning in this regard is disconcerting and blatantly ignores the broad discretionary powers entrusted to the district attorney's office. Particularly, whereas here, such "impressions" and "opinions" carry the weight of another individual's life and liberty. Indeed, ADA Schaeffer advised the East Point PD of his legal conclusions, on official QDA letterhead, to provide them the necessary justification to effect her arrest within their jurisdiction. Contrary to the People's contentions today, ADA Schaeffer's directive to the East Point PD was conditioned only upon a positive identification of Thomas, and not on whether she made inculpatory statements (see Defense Hearing Exhibit G). 
Next, the People contend that its failure to disclose Lt. McGuire's sworn felony complaint charging Thomas with the Bland/Walker homicides is of no consequence because Mr. Schulman was aware of the underlying facts which supported the affidavit: namely, that Thomas beeped defendant to notify him of Bland's location before the shooting (see People's Hearing Exhibit 1, Mark Rogers DD5) as corroborated by her phone records. Yet, the People simultaneously claim that those same facts, without more, would not likely have survived the legal sufficiency test for criminal liability at the arraignment (see People's 440 Hearing Memorandum of Law, dated 12/29/2025, Pg 14, footnote 4). This Court finds that Lt. McGuire's sworn affidavit, unequivocally confers accomplice status upon Thomas. The sworn felony complaint provides that "based on information supplied by person's known to the deponent (Lt. McGuire) and the Queens District Attorney . . . defendant, Vanessa Thomas, acting in concert with an apprehended other . . . did shoot and kill victims . . . Charles Bland and Sherry Walker." Suppression of this material denied defendant the opportunity to explore the basis for the deponent's conclusions before the jury; and to challenge Thomas and Wright's motives for testifying. Simply put, there is no view of this evidence that the sworn felony complaint was merely cumulative to or duplicative of the information provided by Mark Rogers (see People v. Ulett, 33 NY3d 512 [2019]). Further, the sworn felony complaint creates a reasonable view of the evidence in support of an Accomplice as a Matter of Fact/Law and Impeachment by Benefit Conferred Instructions to the jury for Vanessa Thomas (see People v. Fielding, 39 NY2d 607 [1976]).
To be sure, there can be no more impeaching information than where there exists a reasonable view of the evidence that a prosecution witness is implicated in and possibly subject to prosecution for the very crimes on which defendant stands trial (see Giglio v. United States, supra; CPL § 60.22). The gravity of the impact upon such witness' credibility cannot be understated (see People v. Berger, 52 NY2d 214 [1981][traditionally, the law views accomplice testimony with a suspicious eye...]; People v. Duncan, 46 NY2d 74 [1978][accomplice testimony lacks inherent trustworthiness]). By failing to disclose the impeaching material and information enumerated above, defendant was not aware that:
1. ADA Schaeffer, in his capacity as lead prosecutor, made a legal conclusion of probable cause implicating Thomas as an accessory;2. ADA Schaeffer publicly expressed such legal conclusion to the East Point PD to justify Thomas' arrest upon a positive identification;3. HAPD detectives traveled to Atlanta for the purpose of locating, arresting and returning Thomas to New York;4. The lead investigator's direct supervisor in the case, subscribed and verified a sworn felony complaint charging Thomas with the Bland/Walker murders under penalty of perjury;5. that HAPD detectives were searching for Thomas for over a year due to her "flight" [*10]from New York following the Bland/Walker murders;6. that when found in Atlanta, Thomas was living under an assumed name; and7. despite ADA Schaeffer's portrayal of Thomas as an innocent, "inadvertent" participant in the murders, he suppressed information that Sherrie Branch provided to Det. DeFillippis indicating that Thomas was aware of and warned the deceased, Cherrie Walker, that something was going to happen, the day before the murders.Additionally, after a myriad of undisclosed investigative steps pursued to locate and arrest Thomas for the Bland/Walker murders, Mr. Schulman was unaware of the investigation's unexplained shift in her status from target of investigation to cooperative prosecution witness. A shift which creates a reasonable inference that her potential arrest served as leverage to ensure her cooperation and/or she may have been spared arrest in exchange for her testimony. ADA Schaeffer now explains that he changed course simply because he believed her denial of culpability. Even so, such a pivot, for whatever reason, necessarily raises issues surrounding the thoroughness and integrity of the investigation, and whether the leverage of possible arrest provided her a motive to lie (see People v Ulett, 33 NY3d 512 [2019][undisclosed Brady relevant to attack thoroughness of police investigation]; People v Williams, 50 AD3d 1177 [3d Dept 2008][accomplice witness spared enhanced sentencing exposure as a persistent predicate felony offender gives rise to claim of benefit conferred]). All such issues of fact were to be resolved by the jury as the sole factfinder. Instead, the prosecutor's suppression of this material denied defendant access to independent witnesses, including Sgt. Lambert and other East Point PD officers, who had firsthand knowledge regarding the circumstances surrounding Thomas' interaction with the New York HAPD detectives in Atlanta and why no arrest occurred.
Remarkably, Thomas and Wright were the only two prosecution witnesses who testified about defendant's actions before and after the shooting in support of the prosecution's theory that defendant planned the shooting even if he was not present at the time that it occurred. Wright testified under a cooperation agreement as defendant's co-conspirator in planning the murders. As such, the court delivered an Accomplice as a Matter-of-Law charge to the jury pertaining to him. However, Mr. Schulman was unaware of the suppressed information giving rise to a reasonable view of the evidence that Thomas was a willing participant in the crime; as opposed to, as ADA Schaeffer argued, merely a grieving, unwitting, and inadvertent actor who was "duped" into notifying defendant of Bland's whereabouts before the murder. Mr. Schulman explained that he would have requested that the court charge the jury as to Thomas' status as an accomplice. In such case, the court would have instructed the jury that the testimony of one accomplice cannot be used to corroborate the testimony of another (People v Mullens, 292 NY 408 [1944]; People v. O'Farrell, 175 NY 323 [1903]). 
Consequently, were the jury to accept Thomas' status as an accomplice, then both her and Wright's testimony would need to be independently corroborated by other evidence in the case to support a guilty verdict under the "planner" theory (CPL § 60.22; see People v. Gumbs, 56 AD3d 345 [1st Dept 2008]; People v. Crespo, 308 AD2d 383 [1st Dept 2003]; People v. Wilson, 213 AD2d 1037 [4th Dept 1995]). This would mean, before the jury could credit Wright's testimony, it would have to have been corroborated by evidence independent of Thomas' testimony and vice versa (see CPL § 60.22). Since Thomas and Wright were the primary prosecution witnesses to establish defendant's guilt under the "planner" theory, the People's case would have been substantially weakened were a jury to find them both to be accomplices to the criminal transaction. Other than Thomas' phone records establishing that she beeped defendant [*11]just before the murders, the People presented no other evidence detailing the substance or purpose of Thomas' call/beep; nor any other physical or forensic evidence connecting defendant to the murders.
Prosecutors Handwritten Exculpatory Notes of Doria Holly Interview:The People's alternate theory of defendant's guilt relied entirely on the testimony of Jacqueline Aviles, the sole identification eyewitness, who testified that she knew defendant from the area; that she saw two (2) to four (4) people approach and fire multiple shots into the car occupied by Bland and Walker; and that she recognized defendant as one of the shooters. ADA Schaeffer expressed his concerns regarding the strength of the evidence upon his initial review and developed a plan to enhance the case by locating additional witnesses or information to support the charges. 
To that end, at some point before defendant's trial commenced, ADA Schaeffer interviewed Doria Holly, a resident of the Woodside Houses, regarding the Bland/Walker homicides. The People concede that ADA Schaeffer took handwritten notes of Ms. Holly's statement to him (see Defense Hearing Exhibit O); that he did not disclose his notes, or the substance of the information Ms. Holly provided to him before defendant's trial; and that the information Ms. Holly reported constitutes Brady material that he was duty bound to disclose. 
A review of ADA Schaeffer's notes reveal that he received information that there was an eyewitness to the shooting named Willis who claimed that defendant was not present at the time of the shooting and did not commit the murders. Moreover, ADA Schaeffer received information about Willis' full name, approximate age, possible location, and the names of his sisters Wendy and Wilma Campbell. Yet, ADA Schaeffer admittedly abdicated his duty to seek the truth by failing to pursue an investigation into such clearly exculpatory information. He then capitalized on suppression of this information by successfully urging the trial court to preclude defendant from arguing that someone else committed the crime while simultaneously representing that, "there is no admissible evidence along these lines" and "I am presently aware of none" (TT4-5, dated 9/14/1995).[FN13]
This is particularly egregious considering ADA Schaeffer's knowledge of the information he received from Doria Holly to the contrary.
Notwithstanding such a flagrant Brady violation, the People erroneously discount its importance since Willis Campbell of today claims not to have witnessed the shooting. First, for the reasons stated above, I credit the testimony of Wendy and Wanda Campbell and discredit the testimony of Willis Campbell. However, even assuming Willis Campbell's testimony was true, it is not dispositive of defendant's Brady violation claim. It is impossible to know today, what a 19-year-old Willis Campbell would have reported thirty (30) years ago. The law recognizes the infallibility of undertaking such rear-view assessments by requiring this Court to focus on the information as it existed at the time of its revelation (People v. Hunter, 11 NY3d 1 [2008]).
As the Court of Appeals aptly recognized, a Brady violation cannot be cured or nullified by post-trial events (Id.). Clearly, ADA Schaeffer received exculpatory information within the meaning of Brady which, if true, would have completely contradicted the prosecutions only eyewitness identifying defendant as a shooter. Willis Campbell's statements today are wholly irrelevant to what the People's Brady obligations were in 1995 (Id.). By suppressing this evidence, ADA Schaeffer denied defendant meaningful access to favorable witnesses and/or [*12]information which could have directly undermined Aviles' credibility at trial [FN14]
(People v. Rong He, 34 NY3d 956 [2019]). 
Considering the totality of suppressed statements, documents, evidence, and information referenced herein, this Court finds that its disclosure would have significantly weakened both theories of prosecution on which the People relied. Suppression of critical impeachment evidence is even more impactful in this case because the evidence of defendant's guilt rested solely on the credibility of witnesses (see People v. Flores, 217 AD3d 29 [1st Dept 2023]; People v. Ulett, supra). In this Court's opinion, either the undisclosed impeaching evidence relative to Thomas or the exculpatory evidence relative to ADA Schaeffer's handwritten notes alone would suffice to sustain a Brady violation warranting a new trial. However, the magnitude of the prosecutor's combined suppression of Brady/Giglio evidence in this case clearly violated defendant's constitutional right to due process and denied him a fair trial. 
For these reasons, I find that the aggregate effect of the suppressed evidence in this case establishes a reasonable possibility that the outcome of defendant's trial would have been different. Moreover, even applying the higher standard of materiality, I further find that there exists a reasonable probability the suppressed evidence at issue here undermines confidence in the verdict. Accordingly, defendant's motion to vacate judgment of conviction and sentence pursuant to CPL § 440.10 is GRANTED in its entirety and a new trial ordered.
Given the Court's ruling, I need not reach defendant's remaining contentions.
The foregoing constitutes the decision and order of the court.
Dated: January 30, 2026Kew Gardens, NYE N T E RMICHELLE A. JOHNSON, J.S.C

Footnotes

Footnote 1:440 Hearing conducted on October 31, 2025; November 12, 2025, November 14, 2025; November 18, 2025; November 20, 2025; December 3, 2025, December 4, 2025; and December 10, 2025.

Footnote 2:H numerical references pertain to the 440 Hearing Minutes.

Footnote 3:Lt. McGuire is no longer available as a witness due to death.

Footnote 4:In November 1993, Nathaniel Wright had an active warrant for Criminal Possession of a Controlled Substance in the Seventh Degree, a Class A Misdemeanor, pending at the Queens County Criminal Court.

Footnote 5:ADA Schaeffer utilized a "Bates" system for tracking his Rosario/Discovery disclosures to defendant whereby each document disclosed would bear a sequentially stamped number and date of disclosure. If a document did not contain a Bates stamp number, then it was not disclosed to defendant unless, in lieu of a Bates stamp, he made a record of such disclosure orally on the record.

Footnote 6:Since 1991, Willis Campbell has served two terms in Iraq in active combat, has since been diagnosed with post-traumatic stress disorder and hospitalized for mental health treatment.

Footnote 7:Applicable to Lt. McGuire's sworn felony complaint since he testified at a pre-trial hearing.

Footnote 8:Applicable to ADA Schaeffer's handwritten notes of Doria Holly interview exculpating defendant as a shooter.

Footnote 9:Applicable to Lt. McGuires sworn felony complaint (Defense Hearing Exhibit H); ADA Schaeffer's letter of intent to arrest Thomas to East Point PD (Defense Hearing Exhibit G); Det. DeFillippis' DD5 (Defense Hearing Exhibit SS); HAPD Request for Travel Authorization Memorandum (Defense Hearing Exhibit K); and Arrest Warrant and Queens District Attorney Data Sheet bearing an arrest number (Defense Hearing Exhibit W).

Footnote 10:Applicable to all police paperwork, DD5s, and Travel Request Forms in HAPD case folder. (see Defense Hearing Exhibits K, QQ, RR, SS, and TT)

Footnote 11:Applicable to all police and QDA paperwork relative to Thomas's criminal culpability for the offense as suspect/accomplice, and ADA Schaeffer's handwritten notes exculpating defendant as the shooter as referenced above.

Footnote 12:Applicable to ADA Schaeffer's letter of intent to arrest Thomas to East Point PD (Defense Hearing Exhibit G).

Footnote 13:TT numerical references refer to defendant's trial transcript.

Footnote 14:Notably, ADA Schaeffer admitted to an additional Brady/Giglio violation in that he did not disclose to defendant any information and/or documents pertaining to Jacqueline Aviles' pre-trial relocation and expenses incurred for the two-year period leading up to defendant's trial (H83).